*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1695**

State of Minnesota,
Appellant,

vs.

Samantha Dana Schroeder,
Respondent.

**Filed June 10, 2024**
**Reversed and remanded**
**Larson, Judge**
**Concurring in part and dissenting in part**
**Ede, Judge**

Dakota County District Court
File No. 19HA-CR-22-2565

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Heather Pipenhagen, Assistant County Attorney, Hastings, Minnesota (for appellant)

Cathryn Middlebrook, Chief Appellate Public Defender, Eva F. Wailes, Assistant Public Defender, St. Paul, Minnesota (for respondent)

Considered and decided by Ede, Presiding Judge; Reyes, Judge; and Larson, Judge.

**NONPRECEDENTIAL OPINION**

**LARSON**, Judge

Appellant State of Minnesota challenges the district court's decision to grant respondent Samantha Dana Schroeder's motion for a downward durational departure after she pleaded guilty to criminal vehicular operation pursuant to Minn. Stat. § 609.2113,

subd. 1(7) (2020).  Because we conclude that the district court abused its discretion, we reverse and remand for resentencing.

**FACTS**

In October 2022, the state charged Schroeder with violating Minn. Stat. § 609.2113, subd. 1(7), based on probable cause that she hit an 80-year-old bicyclist (the victim) and drove away without investigating the collision.  The victim suffered serious injuries, including a traumatic brain injury, damage to his elbow and ribs, and a broken tooth. Schroeder was 18 years old at the time of the offense.  According to a pre-plea investigation report, when detectives initially contacted Schroeder regarding the incident, she immediately asked, "Did I hurt anyone?" and admitted she was in a collision because she "swerved to avoid a turtle in the road."  According to the pre-plea investigation, Schroeder later admitted that she made up the turtle story because she did not want to make her mother angry.  The pre-plea investigation report recommended that Schroeder receive a presumptive stayed 18-month prison term.

In August 2023, Schroeder entered a petition to plead guilty.  At her plea/sentencing hearing, Schroeder provided the following factual basis to support her plea.  In May 2022, Schroeder was driving a car at around 7:00 p.m.  The sun was in her eyes, and she looked down at her phone.  At some point, she thought she hit a mailbox and noticed damage to her vehicle, including to the passenger's side rearview mirror.  When she looked behind her, she thought she noticed damage to a mailbox but continued driving.  Eventually, detectives located Schroeder and informed her that she had hit the victim.  Schroeder admitted that the victim suffered great bodily harm and that "by leaving the scene of the

2

accident and causing [the victim's] injuries" she violated Minn Stat. § 609.2113, subd. 1(7).

After receiving a victim-impact statement, the district court accepted Schroeder's plea and moved to the sentencing phase. The state requested a stay of imposition, with three years of probation and 45 days in jail. Schroeder requested a downward durational departure "within a misdemeanor range of 90 days" and one year of probation. Schroeder emphasized that she received good grades in college, worked as a nanny and a lifeguard, had "never been in any trouble a day in her life," and had "prosocial friends." She also explained that she hopes to attend medical school someday and noted that a felony conviction may have licensing consequences. Schroeder stated that she was remorseful and would not have "left the scene had she known somebody [had] been injured." She said that at the time of the accident, she was frightened, and it did not occur to her that she might have hit someone.

The district court granted Schroeder's motion for a downward durational departure and imposed a 30-day stayed jail sentence and three months of probation, thereby making the conviction a misdemeanor by operation of law. *See* Minn. Stat. § 609.13, subd. 1(1) (2020). To support its decision, the district court made the following findings.

The district court first indicated its view that the state should have offered Schroeder a stay of adjudication. The district court explained that "there are bad people that do bad things . . . . And then there's the person like you who worries me because it could have been my kids." The district court went on to describe: "With some people you look down at the wrong place. You got distracted. You have the sun in your eyes, and then something

happens and you make a judgment. It could happen to anyone who's never broken the law . . . . That's you." The district court stated that, if it could, it would have given Schroeder an opportunity to keep the crime off her record.

The district court next described its view that the law unreasonably punishes based on the severity of the victim's injuries. The district court stated: "You should have stopped. You didn't. It wasn't intentional, but when you hit something, society rightfully so says stop just in case it's an animal or a person." But according to the district court there is "pressure on prosecutors, pressure on the court system . . . when there's injuries that are bad: Punish." The district court then compared an otherwise law-abiding person who causes a severe injury to "people stealing cars three, four, five times intentionally." The district court explained its view that the law has it "backwards" because the person stealing cars is "a bad person." The district court went on to describe Schroeder as "a victim . . . of political pressure."

Finally, the district court described its view of Schroeder's conduct. The district court found that the only thing Schroeder did wrong was that she did not stop. It found that Schroeder did not "intend to hurt anybody," and she had not been texting, drunk, or drinking. Instead, the district court concluded Schroeder was "just being a kid, just like every other kid." The district court noted that Schroeder had "been traumatized" and "destroyed by the event."

4

The same day as the hearing, the district court issued a sentencing departure report.[1] As mitigating factors related to the offense, the district court noted that Schroeder's crime was "less onerous than usual." As mitigating factors related to the offender, the district court noted that Schroeder "[l]acked substantial capacity for judgment" due to "youth" and "immaturity," and also, that she was "[p]articularly amenable to probation." In alignment with its statements during the plea/sentencing hearing, the district court found that Schroeder's offense warranted reducing the presumptive felony sentence to a mitigated misdemeanor sentence.

This appeal follows.

## DECISION

The state challenges the district court's decision to impose a downward durational departure from the Minnesota Sentencing Guidelines. Specifically, the state asserts that the district court abused its discretion when it determined that Schroeder's conduct was significantly less serious than that typically involved in the commission of felony criminal vehicular operation for leaving the scene of a collision that resulted in great bodily harm.

Under Minn. Stat. § 609.2113, subd. 1 (2020):

> A person is guilty of criminal vehicular operation . . . if the person causes great bodily harm to another not constituting attempted murder or assault as a result of operating a motor vehicle . . . (7) where the driver who causes the accident leaves the scene of the accident in violation of section 169.09, subdivision 1 or 6 . . . .

---

[1] "A 'departure report' is a form completed by the sentencing court when the court pronounces a sentence that is a departure from the presumptive sentence." Minn. Sent'g Guidelines 1.B.6 (Supp. 2021).

5

And Minn. Stat. § 169.09, subd. 1 (2020), provides:

> The driver of any motor vehicle involved in a collision shall immediately stop the vehicle at the scene of the collision, or as close to the scene as possible, and reasonably investigate what was struck.[2]

We afford the district court "great discretion" in its sentencing decisions and review departure decisions for "an abuse of discretion." *State v. Spain*, 590 N.W.2d 85, 88 (Minn. 1999). "A district court abuses its discretion when its reasons for departure are improper or inadequate." *State v. Rund*, 896 N.W.2d 527, 532 (Minn. 2017). "When the district court gives improper or inadequate reasons for a downward departure, we may scrutinize the record to determine whether alternative grounds support the departure." *State v. Solberg*, 882 N.W.2d 618, 623 (Minn. 2016). If a district court gives improper or inadequate reasons for the departure and the record does not contain sufficient evidence to otherwise justify it, we will reverse. *Williams v. State*, 361 N.W.2d 840, 844 (Minn. 1985).

The guidelines establish presumptive sentences for felony offenses. Minn. Stat. § 244.09, subd. 5 (2020). The guidelines seek to "maintain uniformity, proportionality, rationality, and predictability in sentencing." *Id.* Departures from the guidelines are discouraged and should occur only in a small number of cases. *State v. Misquadace*, 644 N.W.2d 65, 68 (Minn. 2002); *see also* Minn. Sent'g Guidelines cmt. 2.D.301 (Supp. 2021). The guidelines instruct that a district court "must pronounce a sentence of the applicable

---

[2] Under Minn. Stat. § 169.09, subd. 6 (2020): "The driver of a vehicle involved in a collision resulting in bodily injury to or death of another shall, after compliance with this section and by the quickest means of communication, give notice of the collision to" the applicable law-enforcement agency. Because Schroeder admittedly did not comply with subdivision 1, law enforcement did not receive any notice under subdivision 6.

6

disposition, within the applicable prison range, and within the applicable length of stay, unless there exist identifiable, substantial, and compelling circumstances to support a departure." Minn. Sent'g Guidelines 2.D.1 (Supp. 2021). Circumstances are substantial and compelling when they are "significantly more or less serious than that typically involved in the commission of the offense in question." *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009).

The guidelines provide a "nonexclusive list of factors" that a district court may use to depart from a presumptive sentence. Minn. Sent'g Guidelines 2.D.3 (Supp. 2021). The guidelines describe two types of departures. The first, dispositional departures, "occur[] when the court orders a disposition other than that recommended in the Guidelines." Minn. Sent'g Guidelines 1.B.5.a (Supp. 2021). The second, durational departures, "occur[] when the court orders a sentence with a prison duration other than the presumptive fixed duration or range . . . or when the court pronounces a length of stay" that departs from that prescribed by additional rules specified in the guidelines. Minn. Sent'g Guidelines 1.B.5.b (Supp. 2021). The imposition of a misdemeanor sentence for a felony conviction is a downward durational departure. *See State v. Dentz*, 919 N.W.2d 97, 101 (Minn. App. 2018); *State v. Bauerly*, 520 N.W.2d 760, 762 (Minn. App. 1994), *rev. denied* (Minn. Oct. 27, 1994).

When granting a downward durational departure, the district court must rely "on factors that reflect the seriousness of the *offense*, not the characteristics of the offender." *Solberg*, 882 N.W.2d at 623-24. Thus, a district court abuses its discretion when it relies on offender-related characteristics like the individual's age, family support, cooperation with law enforcement, or amenability to probation. *See id.* at 624; *State v. Trog*, 323

7

N.W.2d 28, 31 (Minn. 1982). But "a single mitigating factor, standing alone, may justify a downward durational departure." *Solberg*, 882 N.W.2d at 624-25.

The state first argues the district court abused its discretion when it relied on offender-related factors to support Schroeder's downward durational departure. We agree. In its departure report, the district court included as mitigating factors that Schroeder "[l]acked substantial capacity for judgment" due to "youth" and "immaturity" and that she was "[p]articularly amenable to probation." Further, the district court made oral findings at the hearing that Schroeder was otherwise law abiding and "a good person." Because these factors relate to Schroeder's personal characteristics, and not the severity of the underlying offense, the district court abused its discretion when it relied on these factors to support the downward durational departure. *See Solberg*, 882 N.W.2d at 624; *Trog*, 323 N.W.2d at 31.

Schroeder concedes that the district court abused its discretion when it considered offender-related factors but asserts that her remorse was an offense-related factor the district court could have considered to impose a downward durational departure. We disagree.

District courts typically consider remorse an offender-related factor. *See Solberg*, 882 N.W.2d at 625-26. But remorse can justify a downward durational departure if it "is directly related to the criminal conduct at issue and made that conduct significantly less serious than the typical conduct underlying the offense of conviction." *Id.* at 626. However, "statements of regret during the investigation" or in "district court proceedings" cannot justify a downward durational departure. *Id.* That is all that occurred here. At the

plea/sentencing hearing, Schroeder said that she was "extremely sorry." Like in *Solberg*, her after-the-fact remorse does not bear a direct relation to the offense itself. Thus, it would have been an abuse of discretion had the district court considered remorse when it imposed the downward durational departure.

The state next argues the district court abused its discretion when it found Schroeder's offense was "less onerous" than the typical offense. While the district court did not elaborate on its reasoning, the district court found the following offense-related facts at the sentencing hearing: (1) Schroeder was distracted at the time of the collision and (2) Schroeder did not intend to hit or hurt the victim.[3] We agree with the state that these facts are insufficient to show that Schroeder's offense was significantly "less serious than that typically involved in the commission of the offense in question." *See Edwards*, 774 N.W.2d at 601.

First, the district court relied on Schroeder's testimony regarding the cause of the accident. Specifically, Schroeder stated that at the time of the accident she had the sun in her eyes and admitted that she looked down at her phone. And the district court found that at the time of the accident Schroeder was "distracted" and had the sun in her eyes. But the district court failed to explain how causing a motor-vehicle accident while distracted is atypical for an offense of this sort. In fact, a myriad of cases illustrate that accidents involving motor vehicles often occur when the driver is distracted, including distractions

---

[3] The district court also found that Schroeder was not intoxicated at the time of the accident. But Schroder would have been guilty of a different offense had she been intoxicated. *See, e.g.*, Minn. Stat. § 609.2113, subd. 1(2)(i), (3)-(5) (2020).

from the sun or cell phones. *See, e.g., Fenrich v. The Blake Sch.*, 920 N.W.2d 195, 206 (Minn. 2018) ("Stating the obvious, this era's drivers are distracted on a regular basis by their apparent need to remain in constant communication on their cell phones." (quotation omitted)); *Kraus v. Saffert*, 293 N.W. 253, 254 (Minn. 1940) (in negligence action, defendant noted "sun in his eyes" as cause for collision with pedestrian); *see also State v. Linskie*, No. A17-0458, 2018 WL 1462063, at *1 (Minn. App. Mar. 26, 2018) (defendant stated "the sun was in his eyes" as cause for collision), *rev. denied* (Minn. June 19, 2018); *State v. Flores*, No. A21-1749, 2022 WL 2439156, at *4 (Minn. App. July 5, 2022) (evidence suggested defendant was using his phone and eating food prior to collision); *State v. Vadner*, No. A18-1877, 2019 WL 5304176, at *1 (Minn. App. Oct. 21, 2019) (defendant could not see lanes on road because of heavy fog); *State v. Gibson*, No. A18-0936, 2019 WL 1510694, at *1 (Minn. App. Apr. 8, 2019) (defendant had cruise control on and was reaching for a drink while driving through construction zone).[4]

Schroeder argues that *State v. Daniliuk*, No. A21-0123, 2021 WL 4059657 (Minn. App. Sept. 7, 2021) is comparable to the facts of this case. *Daniliuk* is a nonprecedential case and distinguishable. There, the state contested a downward durational departure for causing great bodily harm while "operating a motor vehicle [with] an alcohol concentration of 0.08 or more." *Id.* at *1; Minn. Stat. § 609.2113, subd. 1(4) (2018). To support the downward durational departure, the district court found the defendant's conduct "was less

---

[4] We note that these cases do not occur in the same factual or legal posture as this case and that many are nonprecedential. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c). But we find the cases persuasive in their illustration that collisions with pedestrians often occur when the driver is distracted.

onerous than what is typical in a DWI crim[inal] vehicle operation type offense" because the defendant's sandal got caught in the gas pedal. *Daniliuk*, 2021 WL 4059657, at *1. (alteration in original). We affirmed the district court, concluding, in part, that it was appropriate to consider the cause of the accident because the driver's intoxication alone causes most alcohol-related criminal-vehicular-operation offenses. *Id.* at *3. Thus, because something other than intoxication contributed to the accident, that made the offense "less serious than the typical offense in which the driver's intoxication alone cause[d] harm." *Id.*

Here, unlike *Daniliuk*, the district court found that distraction caused the accident. Notably, the district court did not make any findings to indicate why a motor-vehicle accident caused by distraction is anything other than a typical offense. And in our independent review of the record, we discern no special circumstances that distinguish this case from a typical motor-vehicle accident. Thus, the district court's findings regarding the cause of the accident do not support the downward durational departure.

Second, the district court found that Schroeder neither intended to hit nor hurt the victim, crediting Schroeder's testimony that she thought she hit a mailbox.[5] But the district

---

[5] We note that, if Schroeder had harbored such intent, she would have been guilty of a more severe offense for the great bodily harm the victim suffered. *Mell v. Comm'r of Pub. Safety*, 757 N.W.2d 702, 706, 708-09 (Minn. App. 2008) (holding that state had probable cause to charge defendant with second-degree assault when it had evidence he used his truck to intentionally ram into another vehicle). *Compare* Minn. Stat.§ 609.2113, subd. 1(7) (providing that defendant who inflicts great bodily harm after causing collision and leaving the scene "may be sentenced to imprisonment for not more than five years"), *with* Minn. Stat. § 609.221, subd. 1 (Supp. 2021) (providing that person who "assaults another and inflicts great bodily harm may be sentenced to imprisonment for not more than 20 years").

court cannot rationalize a downward durational departure based solely on the defendant having a mental state the offense necessarily contemplates.[6]

In *Rund*, for example, the supreme court determined the district court abused its discretion when it imposed a downward durational departure because Rund's conduct was not significantly less serious than the typical case. *Rund*, 896 N.W.2d at 534. Rund had posted threatening messages on social media directed at law enforcement, pleaded guilty to terroristic threats, and requested a downward durational departure. *Id.* at 530-31. The district court granted Rund's request, explaining that the "only reason" the crime was less serious was because of Rund's age and mental state. *Id.* at 531. The district court also stated that Rund did not intend to carry out the threats, and that it departed because Rund was "[b]asically, young and dumb. [A] [p]retty good kid who did a bad thing." *Id.* at 531-32, 533 n.10. The supreme court concluded, in relevant part, that "Rund's 'mental state'

---

[6] We recognize that a driver failing to stop with *knowledge* that they hit someone may be more callous conduct, but that is not the legal standard we apply. Instead, we must determine what is a *typical* offense. *Edwards*, 774 N.W.2d at 601. And the legislature explicitly modified Minn. Stat. § 169.09, subd. 1, to remove the requirement that an accident result "in immediately demonstrable bodily injury to or death of an individual" to trigger the prescription to stop. *See* 2014 Minn. Laws 1st Spec. Sess. ch. 186, § 1, at 317. As we have explained previously, after the legislature modified the statute in 2014, all the state must prove to trigger the prescription to stop is that the defendant "actually knew that [s]he was involved in a collision with something"—even a mailbox. *See State v. Hartley*, No. A17-1199, 2018 WL 1902115, at *3 (Minn. App. Apr. 23, 2018) (explaining legislative history of statute), *rev. denied* (Minn. July 17, 2018). That the only appellate decision applying the post-2014 version of Minn. Stat. § 169.09, subd. 1, in the context of Minn. Stat. § 609.2113 included a person having a more callous mens rea than Schroeder does not supersede the legislature's intent to make the *typical* offense one where an individual knew they were involved in a collision with something and failed to stop. *See State v. Watts*, No. A16-0639, 2017 WL 957690, at *1-2 (Minn. App. Mar. 13, 2017), *rev. denied* (Minn. May 30, 2017).

was not a proper reason to impose a downward durational sentencing departure" because "making threats with a reckless disregard of the risk of causing terror" fit squarely within the statute's prohibition. *Id.* at 534.

Our court reached a similar decision in *Dentz*. There, Dentz pleaded guilty to soliciting a minor to engage in prostitution. *Dentz*, 919 N.W.2d at 99. Dentz's presumptive sentence was a stayed 18-month prison term. *Id.* Dentz moved for a downward durational departure, requesting that the district court impose a gross-misdemeanor sentence rather than a felony sentence. *Id.* "Dentz argued that the facts of his case were less serious than the typical case." *Id.* The district court agreed, finding Dentz's offense was less serious than typical because he originally thought he was soliciting an adult and only later learned he was soliciting a 15-year-old. *Id.* at 101. We reversed the district court. *Id.* at 103. Relying on *Rund*, we concluded the district court solely relied on the fact that "Dentz did not initially intend to solicit a minor." *Id.* at 102. We reasoned that "the crime [was] not what [Dentz] intended to do, it is what he actually did." *Id.* And while Dentz may have done a "dumb one-time thing," that was not an offense-related reason to support a downward durational departure. *Id.*

The present case is similar to *Rund* and *Dentz*.[7] It is a crime to cause a collision and fail to stop and investigate what was struck under Minn. Stat. § 169.09. subd. 1. Here,

---

[7] We do not construe *Rund* and *Dentz* to prohibit a downward durational departure where a defendant's *conduct* fits squarely within the purview of a criminal statute. Instead, the common thread in both *Rund* and *Dentz* is that the district court's *only* offense-related finding to support the downward durational departure was that the defendant had a requisite mental state the statute already contemplated. *Rund*, 896 N.W.2d at 531; *Dentz*, 919 N.W.2d at 101. The same is true here; and that is what makes it similar to *Rund* and *Dentz*.

13

Schroeder admitted that she was driving a car and knew she was involved in a collision. *See State v. Hartley*, No. A17-1199, 2018 WL 1902115, at *3 (Minn. App. Apr. 23, 2018) (concluding all the state needs to show is the driver "actually knew that he was involved in a collision with something"), *rev. denied* (Minn. July 17, 2018). Despite noticing damage to her vehicle, Schroeder failed to stop and investigate what was struck. Had Schroeder hit a mailbox, she would have been guilty of a misdemeanor for failing to stop and take reasonable steps to notify the owner of the damage. *See* Minn. Stat. § 169.09, subds. 1, 5, 14(c) (2020 & Supp. 2021); *State v. Larsen*, 901 N.W.2d 433, 438 (Minn. App. 2017) (interpreting Minn. Stat. § 169.09, subd. 5 (2014), to apply to "personal property such as a mailbox"), *rev. denied* (Minn. Nov. 14, 2017). Unfortunately, she struck a person, and that person suffered great bodily harm because of the collision. That Schroeder did not believe she had struck a person does not substantially mitigate the severity of her conduct in failing to stop to investigate. As in *Dentz*, the crime here was not what Schroeder *thought* she had done, but what she actually did. 919 N.W.2d at 102. Schroeder's conduct therefore fits squarely within the statute's prescription that a driver must stop and investigate when they are involved in a motor-vehicle accident, irrespective of their intent or knowledge concerning what was struck. Because Minn. Stat. § 609.2113, subd. 1(7), imposes liability irrespective of the actor's subjective intent or awareness of the consequences of the collision, the district court abused its discretion when it relied on Schroeder's state of mind as a basis for imposing a downward durational departure.

For these reasons, we conclude Schroeder's conduct was not significantly less serious than a typical offense and, therefore, there are not substantial and compelling

14

reasons to justify a downward durational departure. Because the district court relied on improper reasons for granting the downward durational departure and abused its discretion when it sentenced this felony offense as a misdemeanor, we reverse and remand for resentencing consistent with this opinion.

**Reversed and remanded.**

**EDE**, Judge (concurring in part, dissenting in part)

I agree with the majority that the district court abused its discretion to the extent that it relied on respondent Samantha Dana Schroeder's characteristics in deciding to grant Schroeder a downward durational departure. I also agree that, because Schroeder's expression of remorse at the plea/sentencing hearing is not directly related to the criminal conduct at issue and did not make that conduct significantly less serious than the typical conduct underlying the offense of conviction, it cannot justify the downward durational departure that Schroeder received.

But I respectfully disagree with the decision to reverse and remand for resentencing. The district court acted well within its discretion by imposing a downward durational departure because Schroeder's conduct was less serious than the typical violation of Minnesota Statutes section 609.2113, subdivision 1(7) (2020) (criminal vehicular operation resulting in great bodily harm based on leaving the scene). The district court provided an adequate reason to justify the departure: Schroeder's crime was "less onerous than usual." And there is sufficient evidence in the record to justify the departure: Schroeder believed that she had hit a mailbox rather than a person. I would therefore affirm. *See Williams v. State*, 361 N.W.2d 840, 844 (Minn. 1985) (establishing that, "[i]f the reasons given justify the departure, the departure will be allowed[,]" and that, "[i]f the reasons given are improper or inadequate, but there is sufficient evidence in the record to justify departure, the departure will be affirmed").

"[A] single mitigating factor may provide a substantial and compelling reason to impose a downward durational sentencing departure if it shows that the defendant's

conduct in committing the offense of conviction was significantly less serious than that typically involved in the commission of the offense in question." *State v. Solberg*, 882 N.W.2d 618, 627 (Minn. 2016). In determining whether a defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question, "it is proper for the sentencing court to consider the course of conduct underlying the charge for which the defendant is being sentenced." *State v. Cox*, 343 N.W.2d 641, 643 (Minn. 1984); *see also State v. Weaver*, 796 N.W.2d 561, 573 (Minn. App. 2011), *rev. denied* (Minn. July 19, 2011).

Here, the district court found that Schroeder's crime was "less onerous than usual." A determination that a defendant's conduct in committing a crime was less serious than the typical offense is an adequate reason to support a downward durational departure. *See, e.g.*, *State v. Bauer*, 471 N.W.2d 363, 367–68 (Minn. App. 1991) (despite the state's challenge to a "50 percent" downward durational departure for aiding a suicide and felony fetal homicide convictions, affirming based on the conclusion that "the trial court was well within its discretion in finding Bauer's conduct less serious than the typical felony murder (or feticide) offense"), *rev. denied* (Minn. Jul. 24, 1991); *see also Solberg*, 882 N.W.2d at 627.

And there is sufficient evidence in the record to justify this reason for departing. During Schroeder's plea/sentencing hearing, the district court found that Schroeder did not intend to hit or to hurt the victim. I agree with the majority that this finding necessarily credited Schroeder's unrebutted testimony that she believed that she had hit a mailbox. Likewise, the district court implicitly credited the following additional testimony by

Schroeder: (1) that when she looked back after the collision, she did not see any other damage, other than damage to the mailbox; (2) that she did not see a person at any time when she was driving; and (3) that, if she had known it was a person she had hit, she would have stopped immediately, exited her vehicle, called 911, and done everything else she could to help them. *See State v. Blom*, 682 N.W.2d 578, 619 (Minn. 2004) (noting implicit credibility determinations by the district court based on the district court's findings).[1] Moreover, in sentencing Schroeder, the district court cited its 27 years of judicial experience and analyzed the relative seriousness of Schroeder's conduct based on an assessment of her intentions during the crime, thereby conveying its judgment that her conduct was less serious than what is typically involved in this offense. *See Solberg*, 882 N.W.2d at 626 ("[A] district court sits with a unique perspective on all stages of a case, including sentencing, and is in the best position to evaluate the offender's conduct." (quotation omitted)).

It is true that, "[w]hen considering a departure as to duration, a sentencing court must analyze the act as compared with other acts constituting the same offense." *State v. Kujak*, 639 N.W.2d 878, 881–82 (Minn. App. 2002) (quotations omitted), *rev. denied* (Minn. Mar. 19, 2002). For this reason, I decline to rely on cases that do not involve similar offenses of criminal vehicular operation resulting in great bodily harm based on leaving

---

[1] Even without such an implicit credibility finding by the district court, I agree with the majority that, "[w]hen the district court gives improper or inadequate reasons for a *downward* departure, [appellate courts] may scrutinize the record to determine whether alternative grounds support the departure." *Solberg*, 882 N.W.2d at 623. In my view, Schroeder's undisputed testimony provides sufficient evidence to support the district court's decision to grant her a downward durational departure.

the scene.[2] Here, the district court compared Schroeder's conduct to that involved in other types of criminal offenses, but did not expressly compare Schroeder's acts with other cases of criminal vehicular operation resulting in great bodily harm based on leaving the scene. But this is not an abuse of discretion. "[A]pplicable caselaw does not require a district court to describe the conduct involved in a typical offense when making this comparison." *State v. Daniliuk*, No. A21-0123, 2021 WL 4059657, at *2 n.3 (Minn. App. Sept. 7, 2021).[3]

Furthermore, appellate courts determine whether an appellant's offense is typical or atypical by relying on their "collective, collegial experience in reviewing a large number of criminal appeals[.]" *State v. Mattson*, 376 N.W.2d 413, 415 (Minn. 1985) (quotation

---

[2] *See, e.g.*, *Fenrich v. The Blake Sch.*, 920 N.W.2d 195, 198–200 (Minn. 2018) (civil action arising from traffic collision that did not involve culpable driver leaving the scene); *Kraus v. Saffert*, 293 N.W. 253, 253–54 (Minn. 1940) (same); *State v. Linskie*, No. A17-0458, 2018 WL 1462063, at *1–4 (Minn. App. Mar. 26, 2018) (affirming conviction for criminal vehicular homicide based on leaving the scene of a collision causing death, where the victim's body was found floating in a pond 10-15 feet from the passenger side of the defendant's vehicle seconds after the defendant fled, where the factfinder (i.e., the jury) implicitly rejected the defendant's statement to police that he never saw the victim, and where both the jury and this court rejected the defense's claim that there was insufficient evidence that the defendant hit the victim), *rev. denied* (Minn. June 19, 2018); *State v. Flores*, No. A21-1749, 2022 WL 2439156, at *1–3 (Minn. App. July 5, 2022) (reversing the district court's dismissal for lack of probable cause of six counts of criminal vehicular homicide and operation, none of which involved leaving the scene); *State v. Vadner*, No. A18-1877, 2019 WL 5304176, at *1 (Minn. App. Oct. 21, 2019) (affirming a conviction for criminal vehicular homicide based on gross negligence, not on leaving the scene); *State v. Gibson*, No. A18-0936, 2019 WL 1510694, at *1–2 (Minn. App. Apr. 8, 2019) (reversing and remanding a downward dispositional departure for convictions of criminal vehicular homicide and criminal vehicular operation–great bodily harm, both of which were based on gross negligence, not on leaving the scene).

[3] Under Minnesota Rule of Civil Appellate Procedure 136.01, subdivision 1(c), the nonprecedential opinions cited herein are not binding authority and are cited only for their persuasive value.

omitted); *see also Weaver*, 796 N.W.2d at 573–74 ("In the final analysis, an appellate court's decision whether a particular durational departure is justified 'must be based on [its] collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts.'" (quoting *State v. Norton*, 328 N.W.2d 142, 146–47 (Minn. 1982))). In doing so, appellate courts may make comparisons to similar cases. *See, e.g.*, *Tucker v. State*, 799 N.W.2d 583, 587 (Minn. 2011).

The collective, collegial experience of Minnesota appellate courts establishes that the district court did not abuse its discretion in determining that the course of conduct underlying the charge for which Schroeder was sentenced was significantly less serious than typical.[4] One relevant appellate case involved a Minnesota Statutes section 609.2113 conviction based on violations of section 169.09, subdivisions 1 or 6. *See State v. Watts*, No. A16-0639, 2017 WL 957690 (Minn. App. Mar. 13, 2017), *rev. denied* (Minn. May 30, 2017).[5] *Watts* concerned significantly more serious conduct than here, particularly as to

---

[4] As appellant State of Minnesota points out, following the legislature's 2014 amendment of Minnesota Statutes section 169.09, subdivision 1, a driver's failure to immediately stop has been criminal, whether or not the driver knows that the collision has caused immediately demonstrable bodily injury to or death of any individual. *See* 2014 Minn. Laws ch. 186, § 1, at 317. All cases discussed herein for evaluation of the collective, collegial experience of Minnesota appellate courts involve violations of the statute after the effective date of the 2014 amendment.

[5] In *Watts*, "[t]he district court found Watts not guilty of criminal vehicular operation (great bodily harm) in violation of Minn. Stat. § 609.2113, subd. 1(7), but found him guilty of the lesser-included crime of criminal vehicular operation (substantial bodily harm) in violation of Minn. Stat. § 609.2113, subd. 2(7) (2014)[,]" based on a finding that "Watts failed to immediately stop at the scene of the collision in violation of section 169.09, subdivision 1, and that he also failed to give notice of the collision to police by the quickest means of communication in violation of section 169.09, subdivision 6." 2017 WL 957690, at *2.

the defendant's decision to leave the scene of a collision *knowing* that he had injured someone. *See id.* at *1. On top of *Watts*, six nonprecedential appellate opinions involving *any* violation of Minnesota Statutes section 169.09, subdivisions 1 or 6,[6] confirm that the typical leaving-the-scene-with-injury offense involves defendants who flee *knowing* that a person was hurt.[7]

This collective, collegial experience establishes the typical offense to compare with Schroeder's conduct in this case. Based on Schroeder's unrebutted testimony that she believed she struck a mailbox, that she did not see any other damage aside from damage to the mailbox, that she did not see a person at any time, and that she would have immediately stopped if she had known it was a person she had hit, I conclude that the district court did not abuse its discretion in determining that Schroeder's conduct was atypical.

To be clear, I acknowledge that a defendant's conduct is criminal if they are involved in a motor vehicle collision and fail to immediately stop their vehicle at the scene,

---

[6] As provided by the statute, convictions for violating Minnesota Statutes section 609.2113, subdivision 1(7), are based on violations of section 169.09, subdivisions 1 or 6. *See* Minn. Stat. § 609.2113, subd. 1(7) (providing that, "where [a] driver who causes [an] accident leaves the scene of the accident in violation of section 169.09, subdivision 1 or 6[,]" the driver "is guilty of criminal vehicular operation resulting in great bodily harm . . . if the person causes great bodily harm to another not constituting attempted murder or assault as a result of operating [the] motor vehicle").

[7] *See, e.g.*, *State v. Brown*, No. A23-0271, 2024 WL 1251644, at *1–5 (Minn. App. Mar. 25, 2024)*; State v. Harris*, No. A23-0503, 2024 WL 1153984, at *1 (Minn. App. Mar. 18, 2024); *State v. Holloway*, No. A23-0488, 2024 WL 764007, at *1–2 (Minn. App. Feb. 26, 2024), *rev. denied* (Minn. May 14, 2024); *State v. Anderson*, No. A21-1702, 2022 WL 17086771, at *1–3 (Minn. App. Nov. 21, 2022), *rev. denied* (Feb. 14, 2023); *State v. Harvey*, No. A19-0049, 2019 WL 4582544, at *1 (Minn. App. Sept. 23, 2019); *State v. Hartley*, No. A17-1199, 2018 WL 1902115, at *1–2 (Minn. App. Apr. 23, 2018), *rev. denied* (Minn. July 17, 2018).

or as close to the scene as possible, to reasonably investigate what was struck—whether or not they know that they have hit a person. *See* Minn. Stat. § 169.09, subd. 1 (2020);[8] *see also* Minn. Stat. § 609.2113, subd. 1(7). Nonetheless, I conclude that the district court reasonably exercised its discretion to grant a downward durational departure based on its analysis of the relative seriousness of Schroeder's conduct, as informed by the district court judge's 27 years on the bench. And I conclude that the district court's departure decision aligns with the collective, collegial experience of Minnesota appellate courts, as reflected in the opinions mentioned above, which confirm that the typical leaving-the-scene-with-injury offense involves a defendant who flees knowing that they have injured a person. The enhanced degree of cruelty inherent in a defendant's decision to leave the scene of a collision at which the defendant knows that they have hurt someone—i.e., the typical offense conduct, per applicable caselaw—is significantly more serious than the facts here, where Schroeder left the scene without such knowledge. *Cf. Solberg*, 882 N.W.2d at 625 (discussing "consider[ation of] evidence bearing on a determination of the cruelty or seriousness of the conduct on which the conviction was based" (quotation omitted)).

In that connection, I disagree that *State v. Rund*, 896 N.W.2d 527 (Minn. 2017), and *State v. Dentz*, 919 N.W.2d 97 (Minn. App. 2018), compel the conclusion that, because Schroeder is criminally liable under Minnesota Statutes section 609.2113,

---

[8] I likewise appreciate that a defendant's conduct is also criminal if they are "[t]he driver of a vehicle involved in a collision resulting in bodily injury to or death of another" and do not, "by the quickest means of communication, give notice of the collision to the local police department if the collision occurs within a municipality, to a State Patrol officer if the collision occurs on a trunk highway, or to the office of the sheriff of the county." Minn. Stat. § 169.09, subd. 6 (2020).

subdivision 1(7), regardless of her subjective intent, the district court abused its discretion by relying on Schroeder's mental state as a ground for the downward durational departure.

In *Rund*, the Minnesota Supreme Court's holding that the defendant's "'mental state' was not a proper reason to impose a downward durational sentencing departure" was based on the specific facts of that case. 896 N.W.2d at 534. The supreme court expressly noted that the defendant "repeatedly threatened to kill police officers in tweets that were directed to police organizations and singled out the state trooper that stopped him, as well as another officer." *Id.* And the supreme court reasoned that the defendant's "conduct fits squarely within the statute's prohibition against making threats with a reckless disregard of the risk of causing terror, [such that] his conduct was not significantly less serious than the typical case." *Id.*

*Rund* does not, however, stand for the proposition that simply because a defendant's conduct falls within the purview of a criminal statute, the defendant may not receive a downward durational departure. Indeed, if a defendant's conduct does *not* fit squarely within a statute's prohibition, then the defendant is not guilty of the charged offense. *See State v. Jones*, 921 N.W.2d 774, 779 (Minn. App. 2018) ("If the defendant's plea colloquy negates an essential element of the charged crime, the factual basis is inadequate."), *rev. denied* (Minn. Feb. 27, 2019). Aspects of a defendant's offense conduct can be mitigating without failing to satisfy all elements of a charged offense.

In fact, *Rund* analyzed the defendant's course of conduct, including by comparing that conduct to caselaw describing other acts constituting the same offense and by evaluating the state of mind reflected by the defendant's acts. 896 N.W.2d at 535–36. The

supreme court ultimately determined that the defendant's offense conduct was not mitigating, pointing to the following facts: (1) that the defendant "did not send one misguided tweet; he tweeted five separate times, including a threat to use a grenade to kill police officers"; (2) that he "threaten[ed] multiple police officers simultaneously, which made his conduct more severe than a threat against a single person[,]" citing *State v. Murphy*, 545 N.W.2d 909, 917 (Minn. 1996), which affirmed an upward departure in a terroristic threats case for several reasons, including the defendant's "multiple victims"; (3) that the defendant used a function of Twitter "to increase the likelihood that the targets of his threats would actually see them"; and (4) that the defendant "threatened murder, the most serious crime of violence listed" in the statutory prohibition against threatening a "crime of violence." *Id.*

*Dentz* is no different. In *Dentz*, this court cited *Rund* in rejecting the district court's reliance on the defendant's mental state as a basis for granting the defendant a downward durational departure by imposing a gross-misdemeanor sentence following his guilty plea to the felony offense of hiring a minor to engage in prostitution. 919 N.W.2d at 99–101. But, as in *Rund*, this court also undertook a detailed review and comparison of other cases to the facts of *Dentz*, evaluating the relative mental states involved in each of the comparator cases. *Id.* at 102–03. "Based on [this court's] review of this collection of district court cases, [this court] conclude[d] that Dentz's case [was] not less serious than the typical case." *Id.* at 103.

I therefore do not read *Rund* and *Dentz* as holding that a downward durational departure can never be based on consideration of a particular defendant's mental state vis-

à-vis the mental state typically involved in the commission of the offense at hand, if that mental state falls within a criminal statute's prohibition. It is well settled that "[a] durational departure must be based on factors that reflect the seriousness of the *offense* . . . ." *Solberg*, 882 N.W.2d at 623. And "[a] downward durational departure is justified only if the defendant's conduct was significantly less serious than that typically involved in the commission of the offense." *Id.* at 624 (quotation omitted). In other words, all downward durational departures depend on offense conduct.

Construing *Rund* and *Dentz* as prohibiting a downward durational departure where a defendant's offense conduct[9] fits squarely within the purview of a criminal statute precludes any defendant from receiving a downward durational departure simply because

---

[9] I agree with the majority that both *Rund* and *Dentz* address defendants' mental states in deciding whether to uphold downward durational departures. *See Rund*, 896 N.W.2d at 534; *Dentz*, 919 N.W.2d at 103. But I refer to "offense conduct" here because—consistent with the principle that "durational departure[s] must be based on factors that reflect the seriousness of the *offense*," *Solberg*, 882 N.W.2d at 623—neither *Rund* nor *Dentz* rely on a distinction between mens rea and actus reus, as both are offense-related factors. Indeed, *Rund* analogizes to *Solberg*'s treatment of a criminal statute "cover[ing] a range of wrongful acts" in discussing a "terroristic-threats statute [that] includes more than one mens rea[,]" reasoning that the defendant's "*conduct* was not significantly less serious than the typical case" because the defendant's "*conduct* fits squarely within the statute's prohibition against making threats *with a reckless disregard of the risk of causing terror*[.]" 896 N.W.2d at 534 (emphasis added). And in *Dentz*, this court repeatedly construes the defendant's offense conduct as encompassing his mental state in analyzing whether that conduct was less serious than the typical case. 919 N.W.2d at 102–03 (explaining that "[f]urther support for [this court's] conclusion that Dentz's *conduct* is typical is found in the district court cases that he submitted to support his request for a downward durational departure[,]" reviewing the mental states involved in those cases, and rejecting the defendant's "claim[] that his case is distinguishable and less serious than [those] cases because he 'did not seek out a minor[,]'" as well as his "assertion that his *conduct* is less serious than [those] cases because he did not initially intend to solicit a minor" (emphasis added)).

they are guilty of the charge for which they are being sentenced. If that were the rule, it is hard to imagine how any case could qualify for such a departure,[10] given that downward durational departures *must* be tied to offense conduct. *See Solberg*, 882 N.W.2d at 623–24. Indeed, neither the supreme court in *Rund* nor this court in *Dentz* would have needed to compare the defendants' conduct to other cases under such a rule. Instead, both *Rund* and *Dentz* analyzed the criminal conduct at issue in each case, comparing them with other conduct constituting the same offenses. As explained above, it is my view that an application of the same comparative conduct-based analysis as employed in *Rund* and *Dentz* to this case supports affirming the district court's sentencing decision.

---

[10] For example, although the supreme court has noted that "showing the relevance of remorse to a durational departure" is "not . . . an easy task[,]" it has *not* concluded that making such a showing is precluded as a matter of law. *Solberg*, 882 N.W.2d at 626. Instead, *Solberg* held that defendants *can* justify a downward durational departure based on remorse if they "can show that [their] demonstrated remorse is directly related to the criminal conduct at issue and made that conduct significantly less serious than the typical conduct underlying the offense of conviction[.]" *Id. Rund* would conflict with *Solberg* if the former case created a brightline rule that a defendant cannot obtain a downward durational departure based on mental state if they nonetheless have a mens rea proscribed by criminal statute. In other words, remorse-based downward durational departures would not be possible if defendants could not have both a remorseful state of mind and a mens rea sufficient to support a conviction. Thus, if *Rund* and *Dentz* do hold that a defendant may not receive a downward durational departure based on their state of mind during an offense when they nevertheless also had the requisite mental state contemplated by a criminal statute, then *Solberg*'s holding that a defendant's remorse may support a downward durational departure would be illusory. In my view, such a construction runs contrary to *Rund*'s reliance on *Solberg* as binding precedent, its consideration of whether the defendant's remorseful "confession . . . ma[d]e his terroristic threats any less serious than the typical terroristic-threats offense[,]" and its substantive conclusion that the record did "not reflect any offense-related remorse that would provide an alternative ground to support the downward durational sentencing departure." *See Rund*, 896 N.W.2d at 533-35.

Minnesota jurisprudence is replete with examples of appellate courts affirming upward durational departures because they are "extremely deferential" to district court departure decisions, *see Dillon v. State*, 781 N.W.2d 588, 595–96 (Minn. App. 2010), *rev. denied* (Minn. July 20, 2010), and because they recognize that "[t]he district court has great discretion in the imposition of a sentence and the reviewing court cannot substitute its judgment for that of the district court[,]" *Murphy*, 545 N.W.2d at 916. These principles apply with equal force to downward durational departures, even if a district court's sentencing decision perhaps differs from what an appellate court might have done in the first instance.

For these reasons, I respectfully dissent from the majority's decision to reverse and remand for resentencing.